ORIGINAL

IN THE UNITED STATES COURT
OF FEDERAL CLAIMS

FILED
NOV 12 2004
U.S. COURT OF
FEDERAL CLAIMS

NATIONAL ALLIANCE OF POSTAL AND FEDERAL EMPLOYEES

Plaintiff,

v.

THE UNITED STATES OF AMERICA

Defendant.

Civil Action No. 04-1668C

COMPLAINT

For its complaint against the above-named Defendant, the United States of America, Plaintiff, National Alliance of Postal and Federal Employees (NAPFE), by and through counsel, alleges as follows:

INTRODUCTION

1. NAPFE brings this action against the United States Government ("Government" or "Defendant") for breach of contract arising out of the Government's failure to authorize payment for legitimate and reasonable expenses associated with a fee for service health benefit plan made available to federal and postal employees and annuitants under the Federal Employees Health Benefits Program ("FEHB Program" or "Program). From 1965 through 2003, NAPFE provided health care benefits under the FEHB Program to federal employees, postal employees, annuitants, their spouses and families, under a Contract executed with the Office of Personnel Management ("OPM")

on behalf of the Government. The Contract was renewed on an annual basis throughout the claim period. NAPFE provided the health care benefits required under the Contract through various subcontractors including Mutual of Omaha, Blue Cross Blue Shield, Aetna, First Health and OAO Healthcare Solutions, Inc (OAO).

2. By letter dated November 13, 2003 OPM following an audit for Contract years 1998-prior through 2002 disallowed legitimate and reasonable administrative expenses incurred by NAPFE in the amount of $3,166,386 and OPM has informed NAPFE that it would not authorize $367,000 for OAO expenses which NAPFE is currently being sued by OAO for in the United States District Court for The District of Columbia Civil Action No. 1:03CV01773 .

3. The $3,166,386 disallowed were funds necessary to operate the health plan in a manner consistent with contractual and statutory requirements.

4. The Government's failure to authorize and allow the $3,166,386 violates its statutory, regulatory and contractual duties. As a result, NAPFE files this suit seeking a reversal of the decision of OPM disallowing the $3,166,386 and further disputes and challenges the lost investment income figure of $645,037 which the Government has concluded is owed by NAPFE based on the $3,166,386.

## PARTIES

5. Plaintiff, NAPFE, is a national labor organization founded in 1913 and incorporated in the District of Columbia. NAPFE was founded by African American railway clerks as an industrial union for the purpose of fighting racial discrimination in the Postal and Federal Service by the Government and other unions. NAPFE's membership is open to all Postal and Federal employees. In 1965, NAPFE contracted

with OPM to offer an employee organization health plan to its members who were participants in the Federal Employee Health Benefit Program (FEHB). To qualify for membership in the plan enrollees who qualified were required to become members of the union. From 1965 until 2003 when the plan closed, NAPFE provided health care benefits, including maintenance and rehabilitative services, physician and hospitalization benefits, surgical benefits, ambulatory patient benefits, supplemental benefits and obstetrical benefits to over a million participants and their families. NAPFE entered into annual contracts with Defendant to provide these and other health care benefits to federal employees, postal employees, annuitants and dependents qualified under the FEHB Program.

6. Defendant, the United States of America, is the entity ultimately responsible for payment of amounts due under Defendant's FEHB Program Contracts with NAPFE. Under the Contract, the Government is responsible for paying NAPFE the premiums due it for each enrollee in the FEHB Program who elects to join NAPFE's plan. Under the contract the Government is responsible for the authorization of adequate and necessary expenses of NAPFE in meeting its contractual and statutory obligations in providing health care services to the FEHB.

## JURISDICTION AND VENUE

7. This is an action for breach of the Contracts between NAPFE and Defendant arising under the Contract Disputes Act of 1978, 41 U.S.C. §§ 601-613, The Tucker, as amended, 28 U.S.C. § 1491, and the Federal Employees Health Benefits Act, 5 U.S.C. § 8912.

8. NAPFE disputes and herein appeals the OPM determination on November 13, 2003 disallowing the reasonable and necessary expenses and in accordance with the appeal rights provided therein. A copy of the OPM determination is attached as exhibit one.

## FACTS APPLICALE TO ALL COUNTS

### A. **The Federal Employees Health Benefits Program**

9. The FEHB Program is a statutory program through which Defendant provides health benefits to employees of the executive legislative and judicial branches of Defendant, including Government-owned or controlled corporations, the government of the District of Columbia and Gallaudet College. The FEHB Program provides health benefits to current federal employees and their dependents, as well as to certain other qualified individuals, such as retirees, veterans, windows and widowers, and former federal employees ("annuitants"). The individuals eligible who take part in the plan are defined as "enrollees".

10. The FEHB Program was established by the Federal Employees Health Benefits Act of 1959 (Pub.L. 86-382, approved September 28, 1959), as amended ("FEHB Act"). The 1959 Act became effective on or about July 1, 1960, and is codified in Title 5, Chapter 89 of the United States Code (5 U.S.C. §§ 8901-8914)

11. The Act originally authorized the Civil Service Commission to administer the FEHB Program and to issue such regulations as might be necessary to carry out the provisions of the FEHB Act. Subsequently, in 1978, OPM was appointed as the agency with exclusive authority to administer the Program and issue appropriate regulations.

These regulations, promulgated by OPM, are found in Part 890 of Title V, Coder of Federal Regulations (5 C.F.R. Part 890)

12. The FEHB Act created in the Treasury of the United States an Employees health Benefits Fund (The "Fund") that OPM administers, as the agency designated by Defendant to oversee the FEHB Program. The contributions made by enrollees and Defendant to pay for the health benefits provided under the FEHB Program are paid into the Fund. OPM, on behalf of Defendant, is obligated to pay the premiums to health care plans, such as NAPFE, from the accumulated contributions to the Fund.

13. Under the FEHB Act, insurers and health care plans ("plans") offer health care benefits to all federal employees and annuitants in the respective plan's geographic location under contracts with Defendant. Enrollees can choose to enroll in any one of the various plans. New federal employees can enroll in one of the plans upon employment. The enrollees are then allowed to select different plans during certain "open" enrollment periods established each year. Enrollment in employee organization plans generally requires membership in the respective organization with several limited exceptions.

14. For a plan to be available to federal employees and annuitants, the health care plan must enter into one or more contracts with OPM. OPM is Defendant's contracting agent and the overall administrator of the Program. OPM, as the agent for Defendant, contracts with health care plans so that health benefits are available to federal employees and annuitants. The Act makes OPM responsible for setting, through negotiations with plans, the premiums or "subscription rates" that determine how much each plan is paid for enrollees under its contracts.

15. The FEHB Act requires that enrollees be offered several types of health benefit options, including service benefit plans, indemnity benefit plans, employee organizations plans and prepaid plans. Nationwide, over 300 different plans participate in the FEHB Program. Enrollees in employee organization plans can and are required to pay dues and become a member of the organization as a condition to joining the plan.

16. Once an employee or annuitant selects a particular plan, the specific agency or organization employing or responsible for that employee has certain duties under the FEHB Program and the regulations promulgated under the FEHB Act. A prime duty of the agency or organization is to maintain accurate records of the names and birth dates of all federal employees and annuitants enrolled in each plan, and to provide that enrollment information to contracting health care plans, such as NAPFE, on a regular basis.

17. The duty to maintain current enrollment records includes a requirement that Defendant provide health care plans such as NAPFE with timely written notices of changes in the enrollment of plan members, including terminations, cancellations and transfers of enrollees participating in the health care plan. This allows each health care plan to ensure that all enrollees covered by a plan can be identified, that proper services are provided to each enrollee, and that Defendant has made the full premium payments due the health care plan. The regulations governing the FEHB Program obligate Defendant to notify plans promptly of enrollee coverage changes. This duty requires that Defendant provide notice of any changes in the enrollment status of enrollee on "a daily or weekly basis," but under no circumstances to permit such notices of change in enrollment to "accumulate for longer than one week." The Contract between NAPFE and

Defendant specifically incorporates these regulations, including the requirements concerning the notice of change in enrollment.

B. **NAPFE's Contract With Defendant**

18. Defendant and NAPFE entered into FEHB Program Contract No. CS 1164, under which NAPFE provided and made available various health care benefits to enrollees through various underwriters and vendors during the claim period. Defendant annually renewed this Contract with NAPFE.

19. NAPFE was required by the Defendant to maintain accurate records of the services provided to each enrollee and funds utilized by each of its vendors and underwriters.

20. NAPFE was required by Defendant to report annually on all funds expended by the plan and each of its subcontractors and vendors.

21. NAPFE was required to maintain records regarding all plan transactions and membership for a period of up to five years.

22. Defendant during each year in question revised the contract and NAPFE continued to provide health care benefits under the Contract as revised, subject to annual renewals.

20. Defendant, through its exclusive agent, OPM, drafted the provisions of the Contract including all revisions, extensions and amendments thereto, without any input from NAPFE. Other than to participate in establishing the premium rates, benefits and coverage to be provided, NAPFE had no role in drafting the terms and conditions of the

Contract, or the language thereof, and was required to execute the Contract as drafted by Defendant.

21. Under the aforementioned Contract and amendments, NAPFE agreed to provide health care benefits to all enrollees in its plan. In order to enroll federal employees, dependents and annuitants in the plan, Defendant had to forward to NAPFE basic information concerning each enrollee, such as the name, birth date and overage option.

22. Under the terms of the Contract, Defendant had the exclusive right to determine the coverage and eligibility of the FEHB Program enrollees who selected NAPFE. Upon notification of enrollment, NAPFE was required to provide all of the contractual benefits and coverage to the enrollee.

23. Throughout the course of the Contract with Defendant, NAPFE was never allowed to disenroll any plan enrollee unless Defendant notified NAPFE in writing of the change in enrollment status. This applied to enrollees who refused to pay the required membership fee for participating in the plan.

24. The Contract required Defendant to maintain records from which relevant information of all NAPFE enrollees could be determined, and to furnish such information to NAPFE at such times and in such form and detail as to enable NAPFE to maintain a current and accurate record of all enrollees in its plans.

25. To effectuate the enrollment in NAPFE's plan, Defendant was required to provide the relevant information to NAPFE in the manner se forth in Standard Form 2809. Upon receipt of an SF 2809, NAPFE enrolled the FEHB Program participant and provided all of the contracted for health care benefits and coverage to the enrollee.

Coverage continued until NAPFE received proper notice on a Standard Form 2809 or 2810 from Defendant that the NAPFE enrollee canceled or terminated coverage with NAPFE.

26. The Contract, and the incorporated regulations, requires both NAPFE and Defendant to reconcile their records. They must confirm with each other who is or was enrolled in the FEHB Program and the number of enrollees in each. One purpose of reconciling this data is to enable both Defendant and NAPFE to determine the proper amount of premiums owed and paid pursuant to the Contract.

27. The Contract further provides that, upon discovery of a mistake in the reporting data regarding employees' coverage, "an equitable adjustment of charges shall be made."

28. Defendant, through its employing agencies, is further required to maintain an "enrollment inventory" for each carrier through a reporting system of Standard Form 2811s). Each employing agency must prepare and provide an SF-2811 when transmitting the changes in the enrollment status of each NAPFE enrollee. Defendant must provide notice of changes in the enrollment status on at least a weekly basis. Thus, the SF-2811s provide an auditable trail of the enrollment changes. These forms also provide the data to determine the premiums due NAPFE for each payroll period.

29. NAPFE depended upon Defendant to administer accurately the FEHB Program enrollment into NAPFE's plan and to pay the proper premiums under the contract. NAPFE further relied upon FEHB Program statutory, regulatory, and contractual obligations to ensure compliance by the employing agencies with OPM operating policies and procedures.

30. NAPFE received premium payments twice a month through a wire transfer from OPM, the agent of Defendant charged with administering the FEHB Program. The wire transfers neither identified the employing agency making payment nor the enrollees on whose behalf payments were being made.

31. Each quarter, OPM, as Defendant's agent, provided a quarter payment report ("the OPM Quarterly Reap Report") to NAPFE recapping the payments that had been paid in the prior quarter. The OPM Quarterly Recap Reports identified the agencies for whom payment had been made over the previous quarter and the payroll periods for which those payments were made. The OPM Quarterly Recap Reports did not provide, however, information regarding the identity of the enrollees on whose behalf payment was made.

32. Defendant does not provide any direct, head-to-head match of payments to enrollees in the FEHB program. It simply makes lump sum payments twice a month by wire transfer and each quarter provides the Quarterly Recap Reports which provide what each employing agency has paid, but not the identity of the particular enrollees on whose behalf payments were made.

**C. Defendant Failed to Satisfy Its Requirement To Authorize Legitimate and Reasonable Expenses Incurred By Contractors Performing Services For The FEHB**

33. NAPFE maintains an integrated computerized membership accounting system of the relevant information on each NAPFE enrollee. That system includes data on each NAPFE enrollee's date of enrollment and, if applicable, disenrollment, including changes in enrollment status as provided in SF-2809 or SF-2810 forms.

34. NAPFE adhered to the reconciliation process set for the in the Contract, the regulations and the materials provided by OPM. NAPFE reconciled its enrollment records with federal agencies and OPM, and compared its records with the information received from Defendant and the employing agencies.

35. Despite these efforts, some employing agencies failed to provide the information required under the Contract, the regulations and the other materials provided by OPM. Certain employing agencies failed to engage in any reconciliation efforts, others failed to provide complete information, and still others provided information but failed to respond to further inquires.

36. Although NAPFE maintained a computerized enrollment database that reflected all enrollment information provided by Defendant for enrollees in the FEHB Program, regulatory and statutory changes applicable to all health plans including NAPFE required an upgrade and standardization of the computerized enrollment system, the cost of which the Defendant refused to authorize.

37. NAPFE was required by Defendant to maintain records of all enrollee claims and underwriter transactions. Defendant in its final decision dated November 13, 2003 refused to authorize the cost of obtaining and maintaining a system for this statutory and regulatory obligation.

38. NAPFE was required by Defendant to compensate its vendors and underwriters for claims administration and run out expenses and after the expenses were paid, the Defendant in its final decision dated November 13, 2003 refused to authorize and approve payment for said expenses.

39. Defendant during the periods in question verbally directed NAPFE to reduce its operating expenses. In an attempt to reduce the cost of the plan's operation, NAPFE met with officials of OPM to discuss the possibility of self insurance and processing its own claims. Defendant gave oral assurances regarding both yet Defendant in its final decision dated November 13, 2003 refused to approve reasonable and legitimate expenditures related to both.

**COUNT I**

**(Breach Of Contract)**

40. NAPFE repeats and realleges each of the averments contained in Paragraphs 1 through 40 as though fully set forth herein.

41. NAPFE entered into an annually renewed FEHB Program Contract for contract years 1965 through 2003 with Defendant, through Defendant's exclusive agent, OPM. NAPFE fulfilled all of its duties and obligations under the Contract. NAPFE provided and made available to NAPFE enrollees all the health care benefits and coverage under the Contract.

42. NAPFE maintained all of the required records and provided and made available all of the health care benefits, for each of the NAPFE enrollees for the contract years 1998-2003, in accordance with the Contract and the applicable regulations, policies and procedures.

43. Defendant was obligated to comply with all of the terms and conditions of the Contract, the FEHB Act and the implementing regulations that OPM promulgated with respect to the FEHB Program.

44. The Contract, and the incorporated FEHB Act and Regulations, obligate Defendant to authorize and approve payment for the administrative cost associated with the NAPFE plan the subject of this dispute.

## COUNT II

**(Constructive Change)**

45. NAPFE repeats and realleges each of the averments contained in Paragraphs 1 through 44 as though fully set forth herein.

46. Pursuant to the Federal acquisition Regulation Clause 52.243-1 (Alt.I) Changes Clause, incorporated into the Contract, NAPFE is entitled to an equitable adjustment of the Contract to recover NAPFE's increased costs caused by any constructive changes made by Defendant to the Contract.

47. Pursuant to the Contract, an equitable adjustment of the contract also is required with respect to any errors or made in setting the administrative expense limits.

48. Defendant failed to administer properly the Contract, did not authorize adequate administrative expenses for NAPFE and its vendors operation and maintenance of the plan.

49. The failures and refusals of Defendant to administer properly the Contract, and authorize adequate administrative expenses constructively changed NAPFE's performance of the Contract and caused NAPFE to incur additional, materially increased costs to perform the Contract in the amount of $3,811,423.

**COUNT III**

**(Quantum Meruit)**

50. NAPFE repeats and realleges each of the averments contained in Paragraphs 1 through 50 as though fully set forth herein.

51. Defendant and its enrollees and their dependents accepted all the health care benefits and coverage provided and made available to them by NAPFE. None of the services or coverage was ever rejected or determined to be unsatisfactory.

52. Defendant and its enrollees and dependents have been unjustly enriched by accepting substantial goods and services from NAPFE without just compensation.

53. NAPFE is entitled to receive at least the value, in the amount of $3,811,423 in goods and services NAPFE rendered pursuant to the Contract.

54. NAPFE is entitled to receive for payment to OAO $367,000 or that amount deemed appropriate by the United States District Court for the District of Columbia in Civil Action No. 1: 03CV01773 for services rendered to the Defendant in 2002 and 2003

**RELIEF**

WHEREFORE, NAPFE respectfully requests that this Court:

(a) Enter a judgment in its favor against the Defendant reversing OPM final decision 176 and in an amount to be determined at trial, but presently estimated to be $4,178,423.

(b) Award NAPFE the additional expenses incurred due to Defendant's failure to properly perform its obligations under the Contract and the applicable statutes and regulations.

(c) Award NAPFE its reasonable attorneys' fees and court costs;

(d) Grant such other and further relief as the court deems just and appropriate.

Respectfully submitted,

Dated November 13, 2004

George C. Lacy
1628 11th Street NW
Washington, D.C. 20001
(301) 455 6873

Counsel for Plaintiff
National Alliance of Postal
And Federal Employees

RECEIVED NOV 1 4 2003

United States
**Office of**
**Personnel Management** Washington, D.C. 20415

In Reply Refer To: Your Reference:

NOV 13 2003

Mr. James M. McGee, President
Health Plan Union Office
National Alliance of Postal and Federal Employees
1628 11th Street, N.W.
Washington, DC 20001

Final Decision Number 176

Dear Mr. McGee:

This is in reference to Final Audit Report Number YQ-00-02-028, which reported on the operations at National Alliance of Postal and Federal Employees (NAPFE) as Sponsor for the Alliance Health Plan (Plan) in Washington, D.C., under the Federal Employees Health Benefits (FEHB) Program.

The purpose of this letter is to issue a final decision with regard to the unresolved audit findings as discussed in the Final Audit Report and outlined below.

| | |
|---|---|
| Overhead Allocations: | $1,192,150 |
| Subcontract and Related Costs: | $ 372,533 |
| Excess Benefit Brochures: | $ 48,898 |
| Excess Letter of Credit Drawdowns: | $2,197,012 |
| Less Office of the Inspector General adjustment: | $ (644,207) |
| Total | $3,166,386* |

- Discussion of issues - Pages 4 through 12 of the Final Audit Report
- Scope of the issue - Contract years 1998 and prior through 2002 – Schedule B of the Final Audit Report

To date, no funds have been returned to the FEHB Program nor have we received any documentation or correspondence from NAPFE to support their position on the questioned charges. As a result, the Plan is not cooperating with OPM to resolve the audit issues in accordance the provisions of Contract CS 1164.

*As a result, the outstanding amount of $3,166,386 is considered to be an unallowable charge to the FEHB Program. In addition, Lost Investment Income (LII) is owed on the outstanding amount as shown in Section II below.

## II. LOST INVESTMENT INCOME ON UNALLOWABLE, UNALLOCABLE, OR UNREASONABLE CHARGES:

During the audit it was determined that $495,370 was owed to the FEHB Program. We have revised the calculation of the lost investment income (LII) to extend amounts due the FEHB Program from December 31, 2002 through September 30, 2003. The revised calculation shows that the FEHB Program is owed $645,037 based on principal amounts owed (See Enclosure). You should note that LII will continue to accrue until all amounts are returned to the FEHB Program.

48 CFR§1652.215-71 requires the carrier to invest and reinvest all excess FEHB Program funds on hand, and to credit all investment income earned on those funds to the Special Reserve on behalf of the FEHB Program. When the carrier fails to comply with these requirements, the carrier shall credit the Special reserve with investment income that would have been earned at the rates specified by the Secretary of the Treasury.

Failing to comply includes failing to credit any income due the contract and/or failing to place refunds, credits, investment income earned, or other amounts owed the Special Reserve, in income producing investments and accounts.

## III. CONTRACTING OFFICER'S FINAL DECISION

This is the Contracting Officer's final decision regarding these issues from Final Audit Report Number YQ-00-02-028. Please remit $3,811,423 ($3,166,386 + $645,037) to the FEHB Program, within 30 days of this Final Decision.

My decision will be final unless you furnish a written notice of appeal to me and the Armed Services Board of Contract Appeals within 90 days of receipt of this decision, or you file suit in the United States Court of Federal Claims within 12 months of receipt of this decision. You or an attorney acting on your behalf should sign the appeal notice. It should clearly indicate that an appeal is intended, refer to this decision, and identify the contract by number. The notice of appeal should include a statement of the reasons why you consider this decision erroneous.

## II. LOST INVESTMENT INCOME ON UNALLOWABLE, UNALLOCABLE, OR UNREASONABLE CHARGES:

During the audit it was determined that $495,370 was owed to the FEHB Program. We have revised the calculation of the lost investment income (LII) to extend amounts due the FEHB Program from December 31, 2002 through September 30, 2003. The revised calculation shows that the FEHB Program is owed $645,037 based on principal amounts owed (See Enclosure). You should note that LII will continue to accrue until all amounts are returned to the FEHB Program.

48 CFR§1652.215-71 requires the carrier to invest and reinvest all excess FEHB Program funds on hand, and to credit all investment income earned on those funds to the Special Reserve on behalf of the FEHB Program. When the carrier fails to comply with these requirements, the carrier shall credit the Special reserve with investment income that would have been earned at the rates specified by the Secretary of the Treasury.

Failing to comply includes failing to credit any income due the contract and/or failing to place refunds, credits, investment income earned, or other amounts owed the Special Reserve, in income producing investments and accounts.

## III. CONTRACTING OFFICER'S FINAL DECISION

This is the Contracting Officer's final decision regarding these issues from Final Audit Report Number YQ-00-02-028. Please remit $3,811,423 ($3,166,386 + $645,037) to the FEHB Program, within 30 days of this Final Decision.

My decision will be final unless you furnish a written notice of appeal to me and the Armed Services Board of Contract Appeals within 90 days of receipt of this decision, or you file suit in the United States Court of Federal Claims within 12 months of receipt of this decision. You or an attorney acting on your behalf should sign the appeal notice. It should clearly indicate that an appeal is intended, refer to this decision, and identify the contract by number. The notice of appeal should include a statement of the reasons why you consider this decision erroneous.

Should you or members of your staff have any questions, please contact Ron Ostrich (REOSTRIC@OPM.GOV) or Martha R. Bernstein (MRBERNST@OPM.GOV) of my staff at (202) 606-0745. Or, if you prefer, they can be reached via a facsimile at (202) 606-0140.

Sincerely,

Frank D. Titus
Assistant Director
for Insurance Services

Enclosure

cc: Daniel A. Green, Chief
Health Insurance Group II

ENCLOSURE

SCHEDULE C

NATIONAL ASSOCIATION OF POSTAL AND FEDERAL EMPLOYEES
AS SPONSOR FOR THE ALLIANCE HEALTH BENEFIT PLAN
WASHINGTON, D.C.

LOST INVESTMENT INCOME CALCULATION

| | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 Thru 9/30/03 | TOTAL |
|---|---|---|---|---|---|---|---|
| A. QUESTIONED CHARGES (Subject to Lost Investment Income) | | | | | | | |
| ADMINISTRATIVE EXPENSES | $482,136 | $511,054 | $313,992 | $306,399 | | | $1,613,581 |
| ADJUSTMENT FOR ADMINISTRATIVE EXPENSES ** | $0 | ($23,816) | ($313,992) | ($306,399) | | | ($644,207) |
| CASH MANAGEMENT | | $752,211 | $761,999 | $1,144,684 | | | $2,658,894 |
| TOTAL | $482,136 | $1,239,449 | $761,999 | $1,144,684 | | | $3,628,268 |
| B. LOST INVESTMENT INCOME CALCULATION - Simple Interest Method | | | | | | | |
| a. Prior Years Total Questioned (Principal) | $0 | $482,136 | $1,239,449 | $761,999 | $1,144,684 | | |
| b. Cumulative Total | 0 | 0 | 482,136 | 1,721,585 | 2,483,584 | 3,628,268 | |
| c. T Total | $0 | $482,136 | $1,721,585 | $2,483,584 | $3,628,268 | $3,628,268 | |
| d. Treasury Rate: January 1 - June 30 | 6.250% | 5.000% | 6.750% | 6.375% | 5.500% | 5.750% | |
| e. Interest (d * c) | $0 | $12,053 | $58,103 | $79,164 | $99,777 | $104,313 | $353,410 |
| f. Treasury Rate: July 1 - December 31 | 6.000% | 6.500% | 7.250% | 5.875% | 5.250% | 5.000% | |
| g. Interest (f * c) | $0 | $15,669 | $62,407 | $72,955 | $95,242 | $45,354 | $291,627 |
| Total Interest By Year (e + g) | $0 | $27,722 | $120,510 | $152,119 | $195,019 | $149,667 | $645,037 |

** Since actual administrative expenses incurred for the Alliance Health Benefit Plan exceeded the contract expense limitations by $23,816, $387,560, and $1,451,759 in 1999 through 2001, respectively, we decreased the questioned charges that are subject to lost investment income by $644,207